Hugh E. O'LOUGHLIN, Sr., Plaintiff,

v.

THE PRITCHARD CORPORATION, et al., Defendants.

Civ. A. No. 95–2506–GLR.

United States District Court, D. Kansas.

Aug. 11, 1997.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, Michael J. Joshi, Borel & Associates, Kansas City, MO, for Plaintiff.

Paul F. Pautler, Jr., Kimberly A. Jones, Blackwell, Sanders, Matheny, Weary & Lombardi L.L.P., Jay M. Dade, Husch & Eppenberger, Kansas City, MO, Gail M. Hudek & Associates, P.C., Kansas City, for Defendants.

### MEMORANDUM AND ORDER

RUSHFELT, United States Magistrate Judge.

Before the court is a Motion By Defendants For Summary Judgment (doc. 62). Pursuant to Fed.R.Civ.P.56(c), D.K. Rule 56.1, and ¶ h of the Revised Scheduling Order entered January 21, 1997; defendants seek an order granting them summary judgment on each claim of plaintiff. Plaintiff alleges age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621634 and Kansas Age Discrimination in Employment Act (KADEA), K.S.A. 44–1111 to –1121; retaliation under the ADEA, 29 U.S.C. § 623(d); breach of contract; and fraud. He opposes the motion.

Plaintiff also alleged a claim for retaliation under state law for possible filing of a workers' compensation action. In response to the motion of defendants, plaintiff voluntarily dismissed this claim. Defendants recognize the dismissal in their reply brief. The court considers the briefing of the parties to constitute a stipulation of voluntary dismissal. Accordingly, it will dismiss the claim in accordance with Fed. R.Civ.P. 41(a)(1).

### I. Factual Background

The following facts are either uncontroverted or, if controverted, viewed in the light most favorable to the plaintiff. *See Applied Genetics Int'l Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Immaterial facts and facts not properly supported in the record are omitted.

Plaintiff, a resident of New Jersey and former employee of defendant The Pritchard Corporation (TPC), has never been a citizen of the United States. He is a citizen of Cuba and the British West Indies, St. Kitts & Nevis (St. Kitts & Nevis). In mid–1994 St. Kitts & Nevis issued him a passport. At all times material to this litigation plaintiff possessed no other passport.

TPC hired plaintiff when he was 60 years old. It employed him from December 1989 until his layoff effective September 23, 1994. In October 1993 it assigned him to the position of material manager on location at its ADNOC PROJECT–Habshan Site Project (ADNOC project) in the United Arab Emirates (UAE). He was 64 years old during this assignment. Before traveling to the UAE, he trained for several months in Kansas City. He also trained in Paris and London. His position in the UAE, nevertheless, required no specialized skill or particular educational or technical training critical to its performance. It simply required that he be familiar with the type of materials to be received.

Defendants TPC and Black & Veatch, Inc. (Black & Veatch) are related corporations. Black & Veatch employee Kerry Erington (Erington) was project manager on the ADNOC project. During plaintiff's assignment to the project Robert Luke (Luke) of Black & Veatch was manager of field personnel. Defendant Black & Veatch Construction, Inc. (Black & Veatch Construction) assigned its employee, Gary Ferguson (Ferguson), to TPC to ensure the completion of project construction efforts. TPC employee Bill Buffington (Buffington) was general manager of its UAE local office in Abu Dhabi, UAE. Aamir Saddiqi (Saddiqi) supervised plaintiff on the project.

EMASCO, a company located in the UAE, provided interface between TPC and governmental entities of the UAE. It facilitated immigration and obtainment of visas for TPC employees working in the UAE. Another

UAE company, Continental Construction Company (CCC), later replaced EMASCO with regards to obtaining a work visa for plaintiff.

Luke initially anticipated that the assignment of plaintiff to the ADNOC project would last 15 months. He later re-estimated the duration to be 18 months. The starting and ending dates of the assignment, however, always remained subject to the requirements and workload of the project. TPC informed plaintiff that his assignment on the ADNOC project was temporary. He received no information to the contrary from TPC.

As a foreign corporation doing business in the UAE on the ADNOC project, TPC was subject to the laws of the UAE, including Federal Law No. 8 Year 1980 Re (Federal Law 8). Regarding the recruitment of foreign nationals to work within UAE territorial limits, Article 3 of Federal Law 8 requires:

Approval of application for recruitment of non national Labourers for employment in U.A.E. may not be granted unless the following requests are met:

a) Labour recruitment application shall be made by either by [sic] U.A.E. nationals . . . or an organization licensed to operate in U.A.E. which is either sponsored or jointly owned by a national. . . .

. . .

c) That the labour recruited shall not be less than 18 and not more than 60 years old. The maximum age limitation, however, may be waived if the employee to be recruited shall have an extensive and rare experience in the field of his specialization provided the job he has been recruited for employment in U.A.E. shall be of economic importance such waiver shall be sanctioned by the Minister.

Laws of the UAE do not permit individuals to work on a visit visa. Such a visa specifically states: "Employment prohibited." Foreigners working in Abu Dhabi are supposed to have a residency or work visa. Application of this law, however, varies. Erington understood that TPC employees could work on visit visas, according to the "rules" of the UAE. Employees of TPC in fact worked on such visas. Such practice was acceptable to TPC, if it believed work visas

were ultimately obtainable. Employees staying for an "extended period," however, would need a work visa. TPC allowed employees to work on visit visas for short durations. It otherwise required work visas. In some instances an individual could work 12 to 18 months on a visit visa, renewed every three months. Plaintiff perhaps could have worked the duration of the ADNOC project by renewing his visit visa. Working on a visit visa presented a risk, however, that it would be revoked without any prior notice.

TPC had great difficulty obtaining a visit visa for plaintiff. Failure to renew the visa at the appropriate time would result in daily fines. TPC had concerns about its ability to renew the visit visa of plaintiff.

The authority to grant a work visa in the UAE lies within the discretion of its Immigration Department. The Minister of Labour and Social Affairs, however, may waive the maximum age limitation for employees with extensive and rare experience in a particular specialization, if the job is of economic importance. It may also waive the maximum age limitation, if the position of the prospective recruit was of significant importance or a specialty or if he or she were critical to national security or to the performance of a particular function. Lack of a United States or European passport makes it more difficult to obtain a work visa for an individual older than 60.

In the fall of 1993, Erington became aware that UAE law placed an upper age limit on foreign national workers allowed to work in UAE. He had believed the upper limit to be 65.

By November 19, 1993 TPC began processing plaintiff's UAE visit visa application. This was the first step in applying for an UAE-issued work visa. In December 1993 Buffington became concerned about obtaining the necessary work visa because of plaintiff's age and lack of a United States passport. By December 17, 1993 Erington became aware of the potential problem with the age of plaintiff. At the insistence of Erington, Buffington continued to process the application through contacts of TPC at EMASCO. By early January 1994 TPC took the application to immigration in UAE.

Representatives of EMASCO informed Buffington that plaintiff's age and lack of a passport issued by the United States presented difficult obstacles against obtaining a work visa for plaintiff. EMASCO further informed Buffington that UAE officials would not grant a waiver for plaintiff under Federal Law No. 8. Buffington reported these difficulties to Erington. Erington directed him to the necessary steps to ensure that plaintiff received the proper documentation to obtain the required work visa. Erington subsequently informed Ferguson of the difficulties. Ferguson instructed Erington to see what TPC could do with the UAE government to get the application processed.

By early January 1994, Buffington informed Nabeel Al Khamairy (Al Khamairy), general manager of EMASCO, that TPC considered obtainment of a work visa for plaintiff essential to the ADNOC project. Al Khamairy stated that it would be very difficult to get the visa, because plaintiff was older than 60 and had very non-traditional travel documentation. Al Khamairy said, nevertheless, that EMASCO would continue its best efforts to obtain the proper work visa.

Throughout the spring of 1994 TPC, through EMASCO, unsuccessfully attempted to obtain a work visa for plaintiff. At some point TPC referred the matter to Saddiqi to be handled by CCC. In the summer of 1994 Ghassan Uwaydan, manager of administration for CCC, informed Buffington that it would be impossible for TPC to obtain a work visa for plaintiff. In 1994 TPC also began to experience great difficulty in continuing to obtain visit visas for plaintiff to remain in UAE.

Buffington eventually sought assistance to obtain a work visa for plaintiff directly from the ruling families of UAE. He was informed that plaintiff would not receive a work visa, because the position of material manager on the ADNOC project was not critical under the laws of UAE. Erington deemed the position critical to the project. Buffington, furthermore, thought it improbable to find a national of the UAE to fill the position. Immigration officials of the UAE, however, concluded that the position was not critical to the project. They viewed the position as that of a warehouseman, available from all corners of the world, including the UAE. Its immigration agency would not waive the upper age limitation for the position. The UAE denied the initial work visa application. Plaintiff testified that he had no reason to believe TPC failed to submit his work visa application to CCC for processing with the UAE government.

Plaintiff first arrived in the UAE in March 1994 to prepare the site for subsequent material handling relevant to the ADNOC project. From March to September 3, 1994 he worked on the project on successive renewed visit visas. On September 3, 1994 he obtained from Saddiqi an emergency medical leave of absence to return to the United States. By then TPC had concluded that plaintiff would not receive a proper work visa from the UAE. Erington considered and concluded that returning plaintiff to the UAE on a visit visa after his medical leave made no sense in light of the continued refusal to issue a work visa. Erington notified Ferguson that plaintiff would not be returning to the UAE. Erington began to identify potential replacements for plaintiff on the project.

No one made any effort to replace plaintiff until after September 4, 1994. On September 5, 1994 Ferguson told plaintiff he would not be returning to the ADNOC project, because TPC could not obtain a proper work visa for him. Plaintiff informed Ferguson that he had a valid visit visa to return to the UAE.

Plaintiff knew that TPC wanted him to work on the ADNOC project. Prior to March 1994, he had never worked in the UAE. He had no knowledge whether UAE would accept his travel documentation to support his visa application. He knew that Al Khamairy was the EMASCO contact of TPC for visa processing. He does not know what efforts Al Khamairy made to obtain a work visa on his behalf. He has no knowledge of attempts by TPC to secure a proper work visa for him. He has no independent knowledge of the willingness or unwillingness of the UAE government to issue him a work visa.

TPC follows a policy of assigning its employees who return from field assignments, such as the ADNOC project, to other field

projects if available. When no other field assignment is immediately available, it lays the employee off for lack of work. Such practice is standard in the industry. Plaintiff himself has been laid off by many employers during his career for lack of work.

Some field claims work was available when Ferguson laid off plaintiff. He could not assign plaintiff to such work, however, because plaintiff lacked necessary experience to process field claims. Ferguson tried to find other assignments in the Black & Veatch family of companies by checking with Luke regarding possible openings. Ferguson found no available openings as of September 1994. He indicated to plaintiff that there was one job on the horizon in Lake Charles, Louisiana; but Ferguson had no authority to assign anyone to that job as of September 1994. TPC filled the position in Lake Charles with Larry Hebert on February 6, 1995—five months after plaintiff returned from UAE. TPC later replaced Mr. Hebert with Jack Will in December 1995.

Ferguson terminated plaintiff effective September 23, 1994. No jobs then existed for which plaintiff was qualified. Ferguson characterized the termination as a reduction in force. Plaintiff remained eligible for re-hire. Jim Smith succeeded plaintiff on the ADNOC project. He was also over 60 years of age when assigned to the project.

Plaintiff admits that TPC relieved Ferguson of responsibility for its construction operations soon after the lay-off in September 1994. He further admits that he had no communication with any member of management of TPC, other than Ferguson, regarding a promise that he would be assigned to the Lake Charles project.

Plaintiff filed his charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 3, 1995.

## II. Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material," if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. All disputed facts, and reasonable inferences derived from the evidence presented, must be resolved in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Frandsen v. Westinghouse Corp.,* 46 F.3d 975, 977 (10th Cir.1995); *FDIC v. 32 Edwardsville, Inc.,* 873 F.Supp. 1474, 1479 (D.Kan.1995).

The moving party bears the burden to show the absence of a genuine issue of material fact. *Turpin v. State of Kan., Dep't of Corrections,* No. 94–2480–JWL, 1996 WL 227792, at *2 (D.Kan. Apr. 5, 1996). This burden "may be discharged by 'showing'—that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* Courts construe Fed.R.Civ.P. 56 to satisfy one of its principal purposes, namely, to segregate and eliminate factually unsupported claims and defenses. *Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53. "Entitlement to summary judgment must be proven beyond a reasonable doubt." *Duff v. GMC,* 962 F.Supp. 1420, 1422 (D.Kan.1997) (citing *Norton v. Liddel,* 620 F.2d 1375, 1381 (10th Cir.1980)).

## III. Discussion

Plaintiff alleges age discrimination under the ADEA and KADEA; retaliation under the ADEA; breach of contract; and fraud. The court will address each of these in order.

### A. KADEA Claims

Defendants challenge the subject matter jurisdiction of this court over the KADEA claims of plaintiff. They argue that plaintiff has failed to exhaust the administrative remedies of the KADEA, K.S.A. 44–1010. They suggest that plaintiff has produced no evidence of such exhaustion. They further argue that the complaint of plaintiff contains no allegation that he complied with K.S.A.44–1010. Plaintiff does not contest these arguments and suggestions.

■ Section 44–1115 of KADEA adopts the administrative procedures and requirements of the Kansas Act Against Discrimination (KAAD). In addition K.S.A. 44–1115 directs that judicial review of decisions of the Kansas Human Rights Commission (KHRC) "be conducted in the manner provided by K.S.A. 44–1010 and 44–1011."

> In addition to vesting a right in plaintiff to bring an age discrimination charge, K.S.A. § 44–1115 also sets forth the dismissal procedure for a discrimination complaint. Compliance with this dismissal procedure is required in order for plaintiff to exhaust h[is] administrative remedies. As a prerequisite to invoking the court's subject matter jurisdiction under this Act, plaintiff first must exhaust h[is] administrative remedies.

*Collins v. Old Republic Title Co. of Kan. City, Inc.,* No. Civ.A. 96–2246–GTV, 1996 WL 439295, at *4 (D.Kan. July 10, 1996) (citations omitted).

■ "The burden is on plaintiff to plead either that he has exhausted his administrative remedies, or that exhaustion of administrative remedies is not required in his case." *Butler v. Capitol Fed. Sav.,* 904 F.Supp. 1230, 1234 (D.Kan.1995) (quoting *Wrenn v. Kansas,* 561 F.Supp. 1216, 1222 (D.Kan. 1983)); *see also, Clary v. Marley Cooling Tower Co.,* No. Civ.A. 96–2277–KHV, 1997 WL 150048, at *11 (D.Kan. Mar. 12, 1997). Under K.S.A. 44–1010, as applicable to actions brought under KADEA, "[n]o cause of action arising out of any order or decision of the commission shall accrue in any court," unless the party dissatisfied with the decision of the KHRC has petitioned the Commission for reconsideration. "Before a plaintiff may litigate any KAAD claims in court, plaintiff must first receive an unfavorable determination from the KHRC, file for reconsideration of that unfavorable determination and then receive a denial of the reconsideration application." *Davidson v. MAC Equipment, Inc.,* 878 F.Supp. 186, 189 (D.Kan.1995) (citing *Simmons v. Vliets Farmers Coop. Ass'n,* 19 Kan.App.2d 1, 861 P.2d 1345 (1993)). By virtue of K.S.A. 44–1115, a plaintiff in a KADEA case must pursue the same administrative remedies. *See Clary,* 1997 WL 150048, at *11.

■ Plaintiff has not carried his burden to plead and establish exhaustion of administrative remedies. He has filed no charge or complaint of discrimination with the KHRC. At the final pretrial conference he contended that his charge of discrimination with the EEOC constitutes a dual filing with the KHRC and thus has satisfied his duty to file with the KHRC. He has stated no authority for such proposition. Judge Vratil of this court rejected a similar argument in *Clary* for lack of support. *Id.* In *Clary* the court stated that plaintiff there could not satisfy her burden to show exhaustion of administrative remedies when she had failed to file a charge of discrimination with the KHRC. *Id.* It further held that such failure "mandates summary judgment against all claims brought under KADEA." *Id.* The court notes that in the present case the charge of discrimination filed with the EEOC contains a box stating: "I want this charge filed with both the EEOC and the State or local Agency . . . ." Plaintiff did not check that box. (*See* Charge of Discrimination, attached as Ex. M to Suggestions In Supp. of Defs.' Mot. For Summ. J., doc. 63.)

■ Were the court to consider filing with the EEOC as a dual filing with the KHRC, plaintiff has nevertheless shown no exhaustion of administrative remedies. He has not shown that he filed for reconsideration of an unfavorable determination of the KHRC or received a denial of an application for recon-

sideration. Accordingly, the court grants summary judgment on the KADEA claims of plaintiff for his failure to exhaust administrative remedies. A plaintiff must petition the KHRC for reconsideration of its decision in order to exhaust his or her administrative remedies. *Davidson,* 878 F.Supp. at 189.

The Supreme Court of the United States has clarified that the burden on the party moving for summary judgment with respect to an issue on which the nonmoving party bears the burden of proof is not "to produce evidence showing the absence of a genuine issue of material fact," but "[i]nstead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). It found that "conclusion ... bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." *Id.* at 326, 106 S.Ct. at 2554.

■■ Granting summary judgment upon an absence of evidence to support the respondent's case also accords with the law in the Tenth Circuit Court of Appeals. "It is well-settled that a district court may grant summary judgment *sua sponte* provided that the losing party is given sufficient notice and an opportunity to come forward with evidence in opposition." *Wilcox v. Raintree Inns of Am., Inc.,* 76 F.3d 394, 1996 WL 48857, at *2 (10th Cir.1996) (Table, Text in Westlaw). The court may enter such a *sua sponte* order "only when the following conditions are met: (1) there is no dispute of material fact; [and] (2) the losing party has had an adequate opportunity to address the issues involved, including an adequate time to develop any facts necessary to oppose summary judgment." *David v. City & County of Denver,* 101 F.3d 1344, 1358–59 (10th Cir.1996). The Tenth Circuit, furthermore, has affirmed the *sua sponte* granting of summary judgment when the losing party "had adequate opportunity to address all pertinent issues in the case prior to the court's decision." *Hand v. Matchett,* 957 F.2d 791, 794 n. 2 (10th Cir.1992).

The motion here put plaintiff on notice that he had to come forward with evidence to show he had exhausted administrative remedies under the KADEA. He has provided no evidence showing exhaustion. His attempt at the final pretrial conference similarly failed to demonstrate exhaustion under the KADEA. In such instances the court "act[s] well within its authority when it grant[s] summary judgment *sua sponte* in favor of [defendants]." *See Wilcox,* 76 F.3d 394, 1996 WL 48857, at *2. Plaintiff "had adequate notice and sufficient opportunity to meet defendants' arguments contained in the initial motion for summary judgment." *Graham v. City of Oklahoma City,* 859 F.2d 142, 144–45 (10th Cir.1988).

The Supreme Court has instructed courts, furthermore, to grant summary judgment "so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553. In this instance the court finds the standard for the entry of summary judgment to be satisfied. Fed. R.Civ.P. 56(c) directs the court to render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." The evidence before the court shows no genuine issue of material fact with respect to the failure of plaintiff to exhaust his administrative remedies under the KADEA. Granting summary judgment on the KADEA claims also satisfies a principal purpose of Fed. R.Civ.P. 56, namely "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. at 2553.

## B. ADEA Claims

Section 623(a)(1) of Title 29 of the United States Code makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." As a preliminary matter,

defendants argue that the ADEA does not apply, because plaintiff was not an employee within the meaning of the Act during his employment in the UAE. They suggest that plaintiff was not an "employee," because he was and is not a citizen of the United States.

■ "It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."' *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577–78, 93 L.Ed. 680 (1949)). Courts validly use this "canon of construction" to ascertain unexpressed congressional intent. *Id.* (quoting *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577–78). The canon "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963)).

■ Application of this rule of construction involves examining the relevant legislation to determine whether its language "gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Id.* (quoting *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577). Courts must "assume that Congress legislates against the backdrop of the presumption against extraterritoriality." *Id.* They must presume Congress "is primarily concerned with domestic conditions," unless it clearly expresses an "affirmative intention" to the contrary. *Id.* (citations omitted). The party urging extraterritorial application of relevant legislation has the burden to affirmatively show Congress intended to apply it extraterritorially. *Id.* at 250, 111 S.Ct. at 1231.

■ Congress has shown an intent to apply the ADEA abroad. It has provided a "foreign laws exception" to the prohibition of age discrimination. *See* 29 U.S.C. § 623(f)(1). Subsection (f) provides that

[i]t shall not be unlawful for an employer ... (1) to take any action otherwise pro-

hibited under subsections (a), (b), (c), or (e) of this section ... where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause the employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located.

Section 623(h)(1) of the ADEA, furthermore, addresses practices of foreign corporations controlled by American employers. In addition § 623(h)(2) exempts, from ADEA coverage, foreign employers not controlled by American employers. The Supreme Court of the United States has noted in dictum that the ADEA applies "overseas." *Arabian Am. Oil Co.*, 499 U.S. at 258–59, 111 S.Ct. at 1235–36.

Concluding that the ADEA applies overseas does not end the inquiry. Defendants suggest it applies abroad only to American citizens employed by American-controlled employers. Plaintiff suggests that it also applies to him as a non-citizen who is a legal resident of the United States.

The relevant statute provides that an employer may not "discharge *any individual or* otherwise discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). The phrase "any individual" suggests that the Act in general protects noncitizens of the United States from unlawful discrimination. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 339–40, 38 L.Ed.2d 287 (1973) (construing such phrase in Title VII as making Title VII applicable to aliens in the United States).

■ This does not mean, however, that the ADEA protects non-citizens of the United States from discrimination when they work abroad. Prohibiting age discrimination against a non-citizen of the United States working outside the United States or its territories could potentially intrude upon the domestic laws of other nations. Congress has taken care not to violate foreign sovereignty by enacting §§ 623(f)(1) and (h). The statute also states no clear intention for the ADEA to apply to foreign nationals working

abroad. When a statute might intrude upon the "delicate field of international relations" Congress must clearly express its affirmative intention to so intrude. *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957).

Nothing in the ADEA clearly reveals an intent to make the Act applicable to foreign nationals working abroad. With certain exceptions not applicable here, it defines the term "employee" as "an individual employed by any employer." 29 U.S.C. § 630(f). Equally important, however, the term "employee" "includes any individual *who is a citizen of the United States* employed by an employer in a workplace in a foreign country." *Id.* (emphasis added). Such specific inclusion leads to a reasonable negative inference that Congress intended to exclude from the definition of "employee" non-citizens of the United States employed by an employer in a workplace in a foreign country.

The legislative history of the ADEA supports such negative inference. It also reveals a definite intent not to apply the ADEA to foreign nationals working abroad:

> The Committee has added two amendments to the [ADEA] of 1967. The first amendment would assure that the protections of the ADEA would be applicable to any citizen of the United States who is employed by an American employer in a workplace outside the United States.
>
> The purpose behind the amendment is to insure that the citizens of the United States who are employed in a foreign workplace by U.S. corporations or their subsidiaries enjoy the protections of the [ADEA]. When considering this amendment, the Committee was cognizant of the well-established principle of sovereignty, that no nation has the right to impose its labor standards on another country. That is why the amendment is carefully worded *to apply only to citizens of the United States* who are working for U.S. corporations or their subsidiaries. *It does not apply to foreign nationals working for such corporations in a foreign workplace* and it does not apply to foreign companies which are not controlled by U.S. firms. Moreover, it is the intent of the Committee that this amendment not be enforced where compliance with its prohibitions would place a U.S. company or its subsidiary in violation of the laws of the host country.

S.Rep. No. 98–467, at 27–28 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2974, 3000–01 (emphasis added).

The court finds the ADEA inapplicable to non-citizens of the United States working abroad. Such construction comports with the intent of Congress. Congress did not intend to expose American corporations and their subsidiaries to a possible risk of violating foreign laws, which may substitute other priorities for age in employment. Although 29 U.S.C. § 623(f)(1) provides a limited safe harbor for discriminatory practices involving American citizens working abroad, it provides no safe harbor for discrimination against non-citizens of the United States. To accept the position of plaintiff would require the court to disregard the evident purpose of § 623(f)(1), which is "to avoid placing overseas employers in the impossible position of having to conform to two inconsistent legal regimes, one imposed from the United States and the other imposed by the country in which the company operates." *See Mahoney v. RFE/RL, Inc.,* 47 F.3d 447, 450 (C.A.D.C.), *cert. denied,* —— U.S. ——, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995).

■■■■■ Plaintiff suggests that applying the ADEA to American citizens working abroad, but not to legal residents of the United States working abroad violates his right to equal protection under the law. Both the Fifth and Fourteenth Amendments of the United States Constitution provide for equal protection under the law. The Fifth Amendment

> provides that "No person shall ... be deprived of life, liberty, or property, without due process of law." Although this Court [ (the Supreme Court of the United States) ] has always understood that Clause to provide some measure of protection against *arbitrary* treatment by the Federal Government, it is not as explicit a guarantee of *equal* treatment as the Fourteenth Amendment, which provides that "No *State* shall ... deny to any person within its jurisdiction the equal protection of the laws" (emphasis added).

*Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213 [115 S.Ct. 2097, 2106, 132 L.Ed.2d 158] (1995). As a general rule, Courts nevertheless treat equal protection under both Amendments the same. *Id.* at 217–18, 224, 115 S.Ct. at 2107–08, 2111.[1]

 Aliens are entitled to equal protection under the law. *Sugarman v. Dougall,* 413 U.S. 634, 641, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853 (1973); *Raya–Ledesma v. Immigration & Naturalization Serv.,* 55 F.3d 418, 420 (9th Cir.1994). "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State [or the Federal government] bear a heavy burden when it deprives them of employment opportunities." *Application of Griffiths,* 413 U.S. 717, 722, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973).

 "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). "An equal protection violation occurs when the government treats someone differently than another who is similarly situated." *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)).

> The equal protection component of the Fifth Amendment prohibits only purposeful discrimination and when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Harris v. McRae,* 448 U.S. 297, 323 n. 26, 100 S.Ct. 2671, 2691 n. 26, 65 L.Ed.2d 784 (1980) (citations omitted). "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger,* 505 U.S. at 10, 112 S.Ct. at 2331; *see also, Riddle v. Mondragon,* 83 F.3d 1197, 1207 (10th Cir.1996). There is normally no equal protection violation when a rational basis exists for distinguishing between two identifiable groups of individuals. *Boling v. Romer,* 101 F.3d 1336, 1341 (10th Cir.1996).

Plaintiff sets forth nothing, which warrants a heightened review of the ADEA. The court must only determine, therefore, whether a rational basis exists for distinguishing between American citizens working abroad and legal residents of the United States working abroad. The court does find a rational basis. Failure to make such a distinction might intrude upon the domestic laws of other nations and thus upon the "delicate field of international relations." Such basis sufficiently overcomes the constitutional challenge to the ADEA.

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. Where there are "plausible reasons" for Congress' action, "our inquiry is at an end." This standard of review is a paradigm of judicial restraint. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."

---

**1.** The Fourteenth Amendment provides no right to equal protection under federal law such as the ADEA. The Fourteenth Amendment addresses the disability of "States" to deny equal protection, not the federal government.

*FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (citations omitted).

That the ADEA does not apply to non-citizens of the United States when working abroad, however, does not completely determine the claim of plaintiff here. The ADEA remains applicable both before and after his tour of duty in the UAE. Plaintiff alleges that TPC failed to assign him to the Lake Charles project in Louisiana or to desk work elsewhere in the United States. Although the ADEA does not apply to the failure of defendants to reassign plaintiff to the AD-NOC project, it does apply to his claim of age discrimination for alleged failures to assign him to the Lake Charles project or to desk work within the United States, after he returned from the UAE.

Although defendants purportedly move for summary judgment on all aspects of the ADEA claims of plaintiff, they articulate no reason to grant summary judgment on the ADEA claims of plaintiff which seek redress for any age discrimination in the United States *i.e.* the failure of defendants to transfer or hire him upon his return from the UAE. The court thus considers the motion as one for partial summary judgment. *See Wysinger v. White,* No. Civ.A. 95–3473–GTV, 1997 WL 94261, at *1 (D.Kan. Feb. 3, 1997). It grants summary judgment to defendants on the ADEA claim of plaintiff that defendants intentionally discriminated against him on the basis of age for failure to further assign him to the ADNOC project in the UAE.

### C. Retaliation

■ To establish a *prima facie* case of retaliation under the ADEA, plaintiff must show: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action." *Corneveaux v. Cuna Mut. Ins. Group,* 76 F.3d 1498, 1507 (10th Cir.1996) (quoting *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988)). "A causal connection is established where the plaintiff presents 'evidence sufficient to raise the inference that

[his or] her protected activity was the likely reason for the adverse action.' " *Id.* (quoting *Anderson,* 861 F.2d at 634).

> Because reasonable persons may differ on the inferences critical in determining a person's state of mind, summary judgment is more often the inappropriate way of resolving the issue of an employer's retaliatory intent. Nevertheless, when the employee fails to come forth with sufficient evidence to raise a genuine issue regarding the employer's intent or an essential element of her retaliatory discharge claim, the district court may properly grant an employer's motion for summary judgment.

*Nguyen v. IBP, Inc.,* 905 F.Supp. 1471, 1480 (D.Kan.1995) (citing *Koopman v. Water Dist. No. 1,* 972 F.2d 1160, 1164 (10th Cir.1992)).

The first element of the *prima facie* case is not in dispute. Plaintiff clearly took protected opposition to discrimination. He filed a charge of discrimination with the EEOC on April 3, 1995.

■ Defendants suggest that the claim of retaliation fails, however, for lack of adverse employment action after plaintiff filed with the EEOC. They assert that they took no adverse action towards plaintiff after that. They claim the layoff of plaintiff cannot constitute retaliation, because it occurred seven months before the filing. They suggest that plaintiff has shown no adverse conduct contemporaneous or subsequent to April 3, 1995. They thus argue that plaintiff cannot satisfy the second element necessary to establish a *prima facie* case of retaliation. They urge summary judgment on that ground alone.

Plaintiff has alleged, however, that defendants chose not to rehire him in December 1995 for the Lake Charles project, even though he was eligible for rehire. Defendants have presented insufficient evidence to discount the possibility. They .have not shown the absence of a genuine issue of material fact with respect to the second element of the *prima facie* case. Plaintiff, on the other hand, has shown an issue of material fact with respect to whether defendants took an adverse action against him by not hiring or re-hiring him in December 1995.

■ To survive summary judgment on a claim of retaliation, plaintiffs generally must demonstrate a causal connection between their protected activity and the adverse action by their employer. Plaintiffs need not carry that burden, however, if the party moving for summary judgment fails to discharge its burden to show the absence of a genuine issue of material fact with respect to that element of the *prima facie* case. In *Celotex Corp.* the Supreme Court of the United States elaborated on these intertwined concepts:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. . . .
>
> *Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact . . . .*

477 U.S. at 322–23, 106 S.Ct. at 2553 (emphasis added). The moving party must at the very least "point out" to the court "that there is an absence of evidence to support the nonmoving party's case." *See id.* at 325, 106 S.Ct. at 2554.

The motion and supporting memorandum of defendants here make no mention of the third element of the *prima facie* case of plaintiff. Defendants rely only upon the claimed failure of plaintiff to support the second element. Whether the failure to hire plaintiff in December 1995 was causally connected to his EEOC complaint is a question of fact. With respect to the third element of the *prima facie* case of retaliation, the court finds that defendants have not satisfied their burden to show an absence of evidence supporting a causal connection. The burden never shifts, therefore, to plaintiff to show such connection. Summary judgment on the retaliation claim is thus not proper. "A district court cannot grant summary judgment to a defendant on an issue not presented in the . . . motion for summary judgment without notice to the plaintiff." *Biswell Stores Inc. v. Indian Nations Communications of Cushing Inc.,* 98 F.3d 1349, 1996 WL 560798, at *3 (10th Cir.1996) (Table, Text in Westlaw).

■ The arguments of defendants provide insufficient notice to permit summary judgment for failure by plaintiff to show a causal connection between the alleged adverse employment action and his protected activity. The motion does not adequately address that issue, so as to require plaintiff to show evidence of a causal connection to avoid summary judgment. "[T]o rely on the absence of such evidence would, in effect, amount to entry of summary judgment *sua sponte.* This can only be done where 'the losing party was on notice that [ ]he had to come forward with all of h[is] evidence.'" *Tavery v. United States,* 32 F.3d 1423, 1427 n. 5 (10th Cir.1994) (quoting *Celotex Corp.,* 477 U.S. at 326, 106 S.Ct. at 2554). "When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not." *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989). This is not to say that the court is barred from all consideration of a basis for summary judgment simply because that basis is not urged by a party. *See Wilder v. Prokop,* 846 F.2d 613, 626 (10th Cir.1988). When the requirements of Fed.R.Civ.P. 56 are met, the court "can grant summary judgment on grounds other than those raised in the motions before the court if the facts are fully developed showing entitlement . . . to judgment as a matter of law, and if the court is satisfied there is no procedural prejudice to the [losing] party." *Id.* In this instance

defendants simply provided insufficient notice to compel plaintiff to present evidence regarding a causal connection.

■ In their reply brief defendants do make an argument which could perhaps be regarded as "pointing out" an absence of evidence that the conduct in December 1995 was causally connected to the protected activity. The court, however, does not generally consider new arguments presented in a "reply brief when that issue was not raised in the initial motion for summary judgment." *Thurston v. Page*, 931 F.Supp. 765, 768 (D.Kan.1996). Fairness and proper notice dictate such general rule. *Wooten v. Board of Pub. Utils.*, No. Civ.A 95–2182–GLR; 1997 WL 45275, at *2 (D.Kan. Jan. 30, 1997). The court sees no reason to make an exception to the general rule in this instance.

*D. Breach of Express or Implied Contract*

Defendants contend that the claims of plaintiff alleging a breach of contract must fail, because neither an express or implied contract of employment existed. They assert that plaintiff can point to no document, which constitutes an express contract of employment. With regards to the claimed breach of an implied contract, they suggest that plaintiff has neither shown the existence nor the breach of such a contract. They contend that statements in an employee policy manual are insufficient standing alone to create an implied contract of employment. They further contend that mere statements of encouragement by the employer do not create a jury question on the existence of an implied contract.

Plaintiff bases his claim for breach of contract on an International Assignment Compensation Package Balance Sheet of May 11, 1994 and letters from Robert Luke, dated March 16, May 10, and June 30, 1994. Plaintiff contends that these documents contain and memorialize the basic elements of an express contract, *i.e.*, offer, acceptance, and consideration. Alternatively he contends that the documents, along with the policy of defendants to assign employees to the home office or other projects when they come off a project, create an implied contract.

■ "Like most states, Kansas historically has followed the common law doctrine of employment at-will. Employees are considered to be at-will in the absence of an express or implied contract." *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir.1995) (citations omitted). "Kansas follows the general rule that, in the absence of a contract covering the duration of employment, the employment is terminable at the will of either party." *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 172, 872 P.2d 252, 259 (1994) (quoting *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 54–55, 551 P.2d 779 (1976)).

■ The documents cited by plaintiff do not constitute an express contract of employment. The letters do not bind defendant to employ plaintiff for eighteen months or any other period of time. They merely confirm his assignment with an "anticipated" duration of fifteen or eighteen months to a particular work project. The letters otherwise contain no statement regarding duration of his employment with TPC or limits on termination solely for cause. While two letters speak of "anticipated" duration of the *assignment* to the project, none mention duration of *employment*. Plaintiff apparently disregards this distinction. The duration of an assignment to one project does not equate with the duration of his employment with TPC. His employment may take him on successive assignments to many projects. Plaintiff himself argues as much by his contention that he had a right to be assigned to the Lake Charles project. He had worked for TPC for five years prior to his assignment to the ADNOC project.

■ The court finds nothing in the record to suggest that assigning plaintiff to any particular project for a certain duration changed his status as an at-will employee. An express contract of employment for a specific duration must limit the employer's power to terminate the employee earlier only "for cause." If an allegedly express contract of employment contains no statement regarding duration of employment and no limits on termination solely for cause, "no express contract of employment existed between the parties" for a period of time certain. *See Gooch v. Meadowbrook Healthcare Servs. of Flori-*

da, Inc., 77 F.3d 492, 1996 WL 67193, at *5 (10th Cir.1996) (Table, Text on Westlaw).

Had the letters indicated an "anticipated" duration of employment, rather than of an assignment to a project, the conclusion of the court would be the same. The court finds statements of "anticipated" duration too indefinite to transform a person from an at-will employee. Many variables beyond the control of the employer could conceivably shorten the employment from the "anticipated" duration. One letter relied upon by plaintiff, furthermore, specifically notes that his assignment to the ADNOC project was temporary. For the foregoing reasons, the court grants summary judgment on the express contract claim of plaintiff.

 In the absence of an express written contract of employment establishing the employee's status, "it [i]s necessary to look at all the facts to determine whether there was an implied contract of continuing employment at the time of the commencement of the employment." Dickens, 255 Kan. at 174, 872 P.2d at 260. "The existence of an implied contract depends on the intent of the parties, divined from the totality of the circumstances." Anglemyer, 58 F.3d at 537. Under Kansas law "intent of the contracting parties is normally a question of fact for the jury and ... the determination of whether there is an implied contract in employment requires a factual inquiry." Morriss v. Coleman Co., 241 Kan. 501, 512, 738 P.2d 841, 848 (1987).

> [T]he understanding and intent of the parties is to be ascertained from several factors which include written and oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

Id. at 513, 738 P.2d at 849 (quoting Allegri v. Providence–St. Margaret Health Ctr., 9 Kan. App.2d 659, 684 P.2d 1031 (1984)).

 The Tenth Circuit Court of Appeals "has interpreted Morriss and its proge-ny as standing for the principle that, 'whether an implied contract exists which creates a property interest in employment normally is a question of fact for the jury." Anglemyer, 58 F.3d at 537 (quoting Koopman v. Water Dist. No. 1, 972 F.2d 1160, 1164 (10th Cir. 1992)). In Kansas an employee cannot create a question for the jury, however, by reliance on one factor alone. Mitchell v. Coffey County Hosp., 903 F.Supp. 1415, 1422–23 (D.Kan.1995). If the employee presents multiple factors tending to show an implied contract, the court then "must examine the factors set forth in Morriss to determine if sufficient evidence of an implied contract is present." Id.

 Plaintiff here presents multiple factors tending to show an implied contract. He relies upon the four documents mentioned previously and deposition testimony of Robert Luke regarding the letters to plaintiff. Such evidence together with all the circumstances surrounding the assignment of plaintiff to the ADNOC project shows an issue of fact as to the existence of an implied contract of employment. Plaintiff does not dispute that he was an at–will employee when he began his employment with TPC in 1989. A genuine issue of material fact exists, however, as to whether later occurrences and circumstances modified his status.

Citing Morriss, defendants also argue that summary judgment is mandated when the employer shows that an employee policy manual statement disclaiming the creation of an employment contract was brought to the personal attention of the employee and the manual itself contains no inconsistent language. In that case the Kansas Supreme Court noted, however, that a disclaimer in a supervisor's manual does not of itself determine whether an implied contract existed as a matter of law. 241 Kan. at 514, 738 P.2d at 849. It stated that defendant there had not shown notice of a disclaimer to its employees. Nor had defendant shown that it intended to create an unqualified employment-at-will relationship, especially in view of other provisions in the manual and statements made by its supervisors to the employees. Id. at 514, 738 P.2d at 849. The Morriss court did not limit its consideration of the evidence to the

manual itself and whether the defendant had brought the disclaimer contained therein to personal attention of its employees. It also considered statements by supervisors to the employees.

■ Plaintiff here presents evidence of an implied contract of employment, other than the policy manual.

> Because of this additional evidence, the disclaimer[ is] not dispositive as a matter of law. In the ordinary case, the jury would evaluate the ... disclaimer[ ] in conjunction with this extrinsic evidence to determine whether the parties intended to form an implied contract. Both would be part of the totality of circumstances analysis contemplated by *Morriss* and its progeny.

*Anglemyer,* 58 F.3d at 538 n. 2. A disclaimer "is not dispositive when the record contains evidence of statements by company personnel indicating a contrary intent." *Sharon v. Yellow Freight Sys., Inc.,* 107 F.3d 21, 1997 WL 39483, at *2 (10th Cir.1997) (Table, Text on WESTLAW). The court thus denies the request for summary judgment on the claim for breach of an implied contract.

### E. Fraud

Plaintiff also contends that defendants fraudulently or negligently misrepresented to him that they would assign him to the Lake Charles project as materials manager and that the Lake Charles project would have no material manager. He suggests that whether Ferguson promised him the position is a question of fact properly reserved for the jury. He also suggests that inconsistent statements by employees of defendants regarding the staffing of the Lake Charles project at least indicate negligent misrepresentation, if not an intent to deceive. He claims he has offered sufficient evidence upon which a jury could find in his favor on this issue.

Defendants claim plaintiff has shown neither fraudulent nor negligent misrepresentation. They assert that he has shown neither an intent to deceive nor reckless disregard for the truthfulness of their statements. They further contend that he has shown no detrimental reliance on any alleged misstatement. They suggest that he proffers only his opinion that their representatives know-

ingly made untrue statements with an intent to deceive. They contend that such opinion is insufficient to resist summary judgment.

■ To recover on a claim of fraudulent misrepresentation under the laws of Kansas, "a plaintiff must show by clear and convincing evidence that a defendant made a representation or statement of material fact which was untrue and known to be untrue or recklessly made with disregard of its truth or falsity, on which plaintiff reasonably relied to his detriment." *Kelley Metal Trading Co. v. Al–Jon/United Inc.,* 877 F.Supp. 1478, 1482 (D.Kan.1995) (citing *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 738 P.2d 1210, 1230 (1987)).

Viewed in the light most favorable to the plaintiff, the evidence here demonstrates only that defendants misinformed plaintiff that there would be no material manager position on the Lake Charles project. It also shows that Ferguson may have promised plaintiff a position on that project. Defendants have pointed out that no evidence supports the misrepresentation claims of plaintiff.

■ Plaintiff has the burden to show specific evidence demonstrating a triable issue. He has not done so. The court finds no evidence that plaintiff reasonably relied to his detriment upon any promise of Ferguson. It finds no evidence, furthermore, that defendants made any statement with an intent to deceive plaintiff or in reckless disregard for its truthfulness. "Such evidence is necessary to avoid judgment as a matter of law." *Kelley Metal Trading Co.,* 877 F.Supp. at 1482. A party may demonstrate the requisite intent or recklessness by circumstantial evidence. In this instance the court finds no sufficient evidence upon which to draw a reasonable inference of such facts. The absence of such showing by plaintiff controls, "particularly when the court must consider that plaintiff was obligated to make this showing by clear and convincing evidence." *Id.* at 1483.

■ Plaintiff furthermore, has shown no detrimental reliance upon the misrepresentation regarding the Lake Charles project. From the evidence before it, the court can find no detrimental reliance of any kind by plaintiff. By telling him that there would be no material manager position on the project,

defendants in effect said that there would be no position available for him on the project. Had they told him the material manager position was already filled, the net effect would have been the same—the position was not available for plaintiff. Plaintiff has shown nothing to suggest he has foregone other employment opportunities in reliance upon the promise of the position in Louisiana. The claim for fraudulent misrepresentation fails as a matter of law.

Citing *Dugan v. First National Bank,* 227 Kan. 201, 207, 606 P.2d 1009, 1014 (1980), plaintiff suggests that he does not need to present clear and convincing evidence of fraudulent misrepresentation to survive a motion for summary judgment. "State law standards for granting summary judgment are not applicable in federal court." *Garcia v. IBP, Inc.,* No. Civ.A. 93–2338–EEO, 1994 WL 590905, at *6 n. 3 (D.Kan. Oct. 26, 1994). Fed. R. Civ. P. 56 provides the applicable standard for this court. "[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). When a "clear and convincing evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that the jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S.Ct. at 2514. Consequently, to withstand summary judgment in this court on a claim of fraudulent misrepresentation under Kansas law, plaintiff as the nonmoving party carrying the burden of proof at trial must present sufficient evidence of a clear and convincing nature to support a jury verdict in its favor. He has not done so.

Plaintiff also pursues a claim of negligent misrepresentation. Kansas has recognized such a claim. *Mahler v. Keenan Real Estate, Inc.,* 255 Kan. 593, 604, 876 P.2d 609, 616 (1994).

"The elements of negligent misrepresentation differ from those of fraudulent misrepresentation in one major respect: while the latter requires proof that the defen-

dant knew the statement was untrue or was reckless as to whether the statement was true or false, the former merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information." *Id.* at 604, 876 P.2d at 616 (quoting *Huttegger v. Davis,* 599 S.W.2d 506, 514 (Mo.1980) (dissenting opinion)).

The alleged promise of a future position does not constitute negligent misrepresentation. "[A] negligent misrepresentation cause of action is not appropriate [when] the alleged misrepresentation involved a future event." *O'Bryan v. Wendy's Old Fashion Hamburgers of N.Y, Inc.,* No. 96–2227–JWL, 1997 WL 158296, at *7 (D.Kan. Mar. 19, 1997). The misstatement regarding whether there would be a material manager position on that project also does not constitute negligent misrepresentation. As previously discussed, plaintiff has shown no detrimental reliance upon such misrepresentation. The claim for negligent misrepresentation does not survive summary judgment.

Plaintiff has elected to voluntarily dismiss his claim of workers' compensation retaliation. Accordingly, the court will dismiss that claim in accordance with Fed.R.Civ.P. 41(a)(1).

In summary, the court sustains in part and overrules in part the Motion By Defendants For Summary Judgment (doc. 62). It grants summary judgment for defendants and against plaintiff on his claims under the Kansas Age Discrimination in Employment Act; his claim of breach of an express contract of employment; and his claims of fraudulent and negligent misrepresentation. It grants summary judgment for defendants in part and denies it in part on the claims of plaintiff under the Age Discrimination in Employment Act, as set forth herein. It denies summary judgment on the claims of retaliation under the ADEA and breach of an implied contract of employment. It dismisses the claim of workers' compensation retaliation in accordance with Fed.R.Civ.P. 41(a)(1).

IT IS SO ORDERED.